1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DANIEL OCHOA LOPEZ,

          Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,

          Defendant.

_____/

Case No. 1:19-cv-01046-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.   INTRODUCTION

On July 31, 2019, Plaintiff Daniel Ochoa Lopez ("Plaintiff") filed a complaint under 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

_____

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.      BACKGROUND

On November 30, 2015, Plaintiff protectively filed applications for DIB and SSI payments, alleging he became disabled on November 20, 2014, due to diabetes and pain in his back, neck, arms, hands, legs, and feet.  (Administrative Record ("AR") 318, 320, 342.)  Plaintiff was born on August 4, 1965 and was forty-nine years old as of the alleged onset date.  (AR 337.)  Plaintiff completed some school, approximately through the eleventh grade, has past work experience as a painter and an auto-body-repair worker, and can communicate in English.  (AR 341, 343.)

### A.      Relevant Medical Evidence[2]

#### 1.      David Cardona, M.D.

On February 18, 2015, Plaintiff presented to Dr. Cardona, a family care physician, to establish care.  (AR 643.)  Plaintiff was diagnosed with diabetes mellitus and disc degeneration in the lumbar region, and he continued to see Dr. Cardona approximately every two to three months until February 2018 for these conditions.  (AR 643–74.)  Dr. Cardona's treatment notes during these visits recorded that Plaintiff's neck had a normal range of motion and was supple.  (AR 643, 645, 647, 649, 651, 653, 655, 657, 659, 661, 663, 666, 668, 670, 672, 674.)  On May 21, 2015, Dr. Cardona prescribed gabapentin for Plaintiff's pain.  (AR 648.)

On September 24, 2015, Plaintiff presented for shoulder pain.  (AR 649.)  Dr. Cardona diagnosed Plaintiff with carpal tunnel syndrome ("CTS") and provided him with a splint for "[r]ight CTS."  (AR 650.)

On November 24, 2015, Plaintiff complained of foot plain, and a physical exam revealed calluses on his left foot.  (AR 651.)  Dr. Cardona prescribed diabetic shoes.  (AR 652.)  During a visit on January 13, 2016 for toe pain, Plaintiff was prescribed medication for a diabetic foot ulcer.  (AR 653–54.)   On December 14, 2017, Plaintiff was assessed with diabetic neuropathy and "[d]iabetes with calluses."  (AR 672.)  Dr. Cardona's treatment notes from that date indicate that Plaintiff had left foot calluses with bilateral numbness to all toes and that Plaintiff was at "high risk [for] diabetic foot ulcers."  (AR 672.)

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

On June 30, 2016, Plaintiff presented for an evaluation recheck and was diagnosed with lumbar disc disease.  (AR 660.)  Dr. Cardona ordered various blood tests and a magnetic resonance imaging scan ("MRI") without contrast of Plaintiff's lumbar spine.  (AR 660.)

On July 26, 2016, Plaintiff underwent the MRI, which showed multilevel anterior osteophytes, mild to moderate disc height loss at L2-L3 and L4-L5, and mild disc height loss at L3-L4 and L5-S1.  (AR 48.)  The narrowing at L2-L3 correlated clinically for impingement of the exiting left L2 nerve root.  (AR 485.)  There was no evidence of spondylolisthesis or pars defects.  (AR 485.)  The attending radiologist, Robert D. Simon, M.D., compared the images with an MRI of Plaintiff's lumbar spine dated December 21, 2010, and found that, overall, there was no change compared to the prior examination.  (AR 485–86.)

On August 31, 2017, Plaintiff was diagnosed with cervical disc disease.  (AR 669.)

On November 27, 2017, Dr. Cardona submitted a medical source statement on Plaintiff's behalf.  (AR 520–23.)  Dr. Cardona stated that Plaintiff had back pain with radiation to the legs and was unable to sit or stand for prolonged periods.  (AR 520.)  Plaintiff's pain medications caused him to experience sedation and dizziness.  (AR 520.)  Dr. Cardona opined that Plaintiff was incapable of even "low stress" work because Plaintiff's "pain would cause lack of concentration."  (AR 522.)  Dr. Cardona opined that Plaintiff could sit or stand for only ten minutes at a time, and that in an eight-hour working day, Plaintiff could sit and stand/walk for less than two hours.  (AR 521.)  When engaged in occasional standing or walking, Plaintiff would have to use a cane due to imbalance, pain, and weakness.  (AR 521.)  Plaintiff would also need to take several breaks a day due to muscle weakness, pain, and adverse effects of medication.  (AR 521.)  Dr. Cardona further opined that Plaintiff could: rarely lift and carry ten pounds or less and never lift and carry twenty pounds or more; rarely twist, stoop, crouch, squat, and climb stairs; never climb ladders; and grasp, turn, and twist objects and engage in fine manipulations for only five percent of the workday.  (AR 522.)

On April 5, 2018, on the referral of Dr. Cardona, Plaintiff consulted with Sanagaram Shantharam, M.D., an orthopedic surgeon, regarding his hand pain.  (AR 680–81.)  Dr. Shantharam assessed Plaintiff with advanced CTS bilaterally and subsequently scheduled a "carpal tunnel release, synovectomy, and possibly neural lysis" for Plaintiff's right hand.  (AR 679, 681.)

1  **2.  Rohini Joshi, M.D.**

2  On November 11, 2015, Plaintiff presented to Dr. Joshi, a neurologist, for bilateral hand

3  numbness and tingling.  (AR 426, 438.)  Plaintiff reported that the numbness and tingling were

4  worse in his right hand and had been ongoing for several years.  (AR 438.)  The symptoms in his

5  left hand started about three to four months prior and involved his left three fingers.  (AR 438.)

6  Plaintiff also reported pain and numbness on the right side of his neck.  (AR 438.)

7  An examination showed numbness in Plaintiff's median nerve distribution and positive

8  Tinel's signs bilaterally.[3]  (AR 440.)  Dr. Joshi observed normal coordination, reflexes, gait, and

9  muscle tone in Plaintiff's extremities.  (AR 440.)   Plaintiff was diagnosed with CTS and cervical

10  spondylosis.  (AR 427, 440.)  Treatment notes from subsequent visits were largely unchanged,

11  except that, on February 10, 2016, Dr. Joshi noted Plaintiff's sensation in his left upper extremity

12  was "intact 4/5."  (AR 474, 477, 479, 537, 543, 554.)

13  **3.  Consultative Examiner Dale H. Van Kirk, M.D.**

14  On April 3, 2016, Dr. Van Kirk, an orthopedic surgeon, conducted a comprehensive

15  orthopedic evaluation of Plaintiff.  (AR 453–57.)  Plaintiff complained of a history of low back pain

16  radiating down to his legs in addition to neck pain radiating down to his arms.  (AR 453.)

17  Dr. Van Kirk noted that Plaintiff was "in no acute distress" during the examination.  (AR

18  454.)  Plaintiff sat "comfortably in the examination chair" and was able to get out of the chair, walk

19  around the examination room, and get on and off the examination table "without difficulty."  (AR

20  454.)  Dr. Van Kirk observed that Plaintiff's "[t]andem walking with one foot in front of the other

21  [wa]s satisfactory," and Plaintiff could get up on his toes and heels.  (AR 455.)  When Dr. Van Kirk

22  asked Plaintiff to squat down and take a few steps, Plaintiff was able to squat down about halfway

23  but could not go further because of chronic back pain.  (AR 455.)  Plaintiff entered and exited the

24  examination room with a normal heel/toe gait pattern, and Dr. Van Kirk did not detect a limp.  (AR

25  454–55.)  Plaintiff neither had an assistive device present, nor had one been prescribed.  (AR 455.)

26

27

28  ---
[3] Tinel's sign is positive when tapping the front of the wrist produces tingling of the hand.  *See Carpal Tunnel Syndrome*, Medicine Net, https://www.medicinenet.com/carpal_tunnel_syndrome/article.htm (last visited Nov. 13, 2020).

Dr. Van Kirk noted that Plaintiff had generalized discomfort in the mid-cervical spine area, mainly the right paracervical soft tissues.  (AR 455.)  As for his lumbar region, Plaintiff's main pain was in the mid-lumbar spine area, and the pain radiated into his waist area posteriorly and into his buttocks bilaterally.  (AR 455.)  During the examination, Plaintiff was able to "bend over to within eight inches of touching the floor with his long fingers."  (AR 455.)  Plaintiff's deep tendon reflexes were "bilaterally equal but present only in the biceps reflexes in the upper extremities."  (AR 456.)  Dr. Van Kirk did not detect patellar reflexes or ankle jerks "on either side."  (AR 456.)  Plaintiff's examination was otherwise normal.  (AR 455–56.)

Dr. Van Kirk diagnosed Plaintiff with "[c]hronic cervical and lumbosacral musculoligamentous strain/sprain, likely associated with degenerative disc disease."  (AR 456.)  Dr. Van Kirk also assessed Plaintiff's residual functional capacity ("RFC")[4], opining that Plaintiff could stand and walk cumulatively for six hours in an eight-hour workday and lift and carry ten pounds frequently and twenty pounds occasionally.  (AR 456.)  Dr. Van Kirk further opined that Plaintiff was limited to only occasional postural activities, and, because Plaintiff's symptoms were enhanced with cold weather, he should not be required to work in an extremely cold and/or damp environment.  (AR 456–57.)  No other limitations were found, and Dr. Van Kirk opined that assistive devices were not medically necessary.  (AR 456–57.)

### 4. UCSF Medical Center

On February 6, 2017, Plaintiff underwent a surgical cervical discectomy and fusion at C5-6 and C6-7.  (AR 493–96.)  On April 7, 2017, Plaintiff presented for a follow-up visit after his surgery.  (AR 558.)  An x-ray of Plaintiff's cervical spine showed that the instrumentation and hardware remained in "very good position" and intact.  (AR 559.)  Tiffany Wong, a physician assistant ("P.A."), noted that Plaintiff was "progressing well overall, his neck and upper arm pain [wa]s much improved."  (AR 558.)  Plaintiff continued to experience bilateral hand pain, in addition to low back

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

pain and foot pain.  (AR 558.)  Plaintiff took oxycodone QHS and gabapentin BID for the pain.  (AR 558.)  Plaintiff denied any tingling, numbness, weakness, or bowel/bladder dysfunction, and P.A. Wong did not observe any balance or gait instability.  (AR 558.)  Plaintiff was able to heel, toe, and tandem walk without difficulty and could also ambulate in a normal fashion.  (AR 558.)  An examination revealed positive Tinel's and Phalen's signs and diminished sensation in the first to third digits Plaintiff's hands bilaterally.[5]  (AR 558.)  Plaintiff wore splints for his CTS.  (AR 558.)

Treatment notes from June 15, 2017, August 9, 2017, and February 7, 2018 were largely unchanged.  (AR 559–62.)  Plaintiff reported some continued difficulty with fine motor skills and frequently dropping items.  (AR 559, 561–62.)  P.A. Wong noted during the visit on February 7, 2018, that Plaintiff "ha[d] recovered well and [wa]s very happy with his postoperative result" and that Plaintiff had some low back problems and would be "getting an injection soon."  (AR 563.)

### 5.      LAGS Medical Centers

On August 23, 2017, on the referral of Dr. Cardona, Plaintiff presented to LAGS Medical Centers for his lower back pain.  (AR 569, 600.)  Plaintiff reported that his pain level was a ten out of ten without medication and a four out of ten with medication.  (AR 600.)  Plaintiff also reported pain, tingling, and loss of sensation in his hands and feet.  (AR 601.)  Physical examination revealed an abnormal lumbar spine range of motion, normal strength in his lower extremities, normal sensation, negative straight leg raising, and a normal gait.  (AR 601–02.)  Plaintiff was assessed with "[b]ulging lumbar disc," degenerative disc disease, and lumbar radicular pain.  (AR 603.)  Findings from subsequent examinations during the end of 2017 and beginning of 2018 remained largely unchanged.  (AR 571–72, 579, 584–84, 588–89, 593–94, 598.)  Plaintiff reported to an examination on February 14, 2018 with a cane.  (AR 579.)

On September 1, 2017, a nerve conduction velocity test ("NCV") and electromyogram ("EMG") of Plaintiff's bilateral lower extremities were conducted.  (AR 497.)  A report of the findings noted:

---

[5] Phalen's sign is positive when bending the wrist downward produces tingling of the hand.  *See Carpal Tunnel Syndrome*, Medicine Net, https://www.medicinenet.com/carpal_tunnel_syndrome/article.htm (last visited Nov. 13, 2020).

1
2
3

Borderline abnormal bilateral lower and borderline abnormal right upper nerve conduction study with normal bilateral lower needle EMG exam; there is electrodiagnostic evidence of early signs of a large fiber peripheral polyneuropathy. There is no electrodiagnostic evidence of bilateral lumbar radiculopathy on this study.

4   (AR 497.)

5   **6.     Fresno Surgery Center**

6   On August 17, 2018, Plaintiff underwent right hand carpal tunnel release, synovectomy in

7   the carpal canal, and superficial neurolysis.  (AR 35, 37–38, 130.)   About an hour after the

8   completion of the surgical procedures, Plaintiff reported numbness and that his "pain [had] eased to

9   a level of 3 now and [was] tolerable."  (AR 38, 44.)  Plaintiff was able to move his fingers.  (AR

10  44.)  When Plaintiff was discharged later that day, he denied having any pain.  (AR 46.)

11  **B.     Plaintiff's Statement**

12  On December 14, 2015, Plaintiff completed a "Pain Questionnaire," in which he complained

13  of pain in his lower back, neck, legs, feet, and hands that began in the summer of 2010.  (AR 355.)

14  According to Plaintiff, the pain occurs when he gets out of bed, steps onto the floor, gets in and out

15  of the shower, stands while making something to eat, and cleans around the house.  (AR 355.)  He

16  stated that the pain lasts most of the day and that resting relieves the pain only sometimes.  (AR

17  355.)  Plaintiff also stated that he takes medication for the pain and experiences relief about four to

18  five hours later.  (AR 355.)  He experiences drowsiness and sometimes becomes "a little" nauseous.

19  (AR 356.)  Plaintiff noted that he was waiting for testing to determine whether he has CTS in his

20  right hand and that he might need spine surgery.  (AR 356.)  Plaintiff also stated that he uses a wrist

21  brace while sleeping to relieve pain in his hand, in addition to using a waistbelt for some back

22  support.  (AR 356.)

23  According to Plaintiff, he must constantly stop an activity because of pain.  (AR 357.)

24  Plaintiff stated that he can walk twenty to thirty feet outside of his home, that he can stand for five

25  to ten minutes and sit for thirty minutes at one time, and that he needs assistance cleaning, "throwing

26  garbage," and feeding his pets.  (AR 357.)

27  **C.     Administrative Proceedings**

28  The Commissioner initially denied Plaintiff's applications for SSI and DIB benefits on

December 7, 2015 and May 9, 2016, respectively.  (AR 223, 235.)  Plaintiff's application for DIB benefits was denied again on reconsideration on August 23, 2016.  (AR 241, 246.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 252.)  At the hearing on April 25, 2018, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions.  (AR 164-90.)

### 1.    Plaintiff's Testimony

Plaintiff arrived at the hearing with a brace on his right wrist and a cane.  (AR 172–73.) He testified that he has been using the cane for about a year after he started experiencing vertigo and losing his balance.  (AR 174–75.)  Plaintiff had undergone surgery on his spine and "neck area."  (AR 172.)  The surgery helped with the pain "some," relieving his shoulder pain, but he still awakens in the mornings with pain in his low to middle back area.  (AR 173.)  Plaintiff also testified that he has CTS in both hands, with the right one being worse.  (AR 173.)  He stated that that he is unable to pick up a milk carton, open a jar of pickles, or pick things up.  (AR 183.)  His wife helps him with his socks.  (AR 177.)  According to Plaintiff, he gets diabetic ulcers on his feet "all the time."  (AR 181.)

Plaintiff also complained of sharp pain and numbness in his hands in addition to swelling in his left foot.  (AR 173, 175.)  To alleviate the swelling, he soaks his feet in Epsom salt and warm water and takes medication.  (AR 175–76.)  Plaintiff uses Aspercreme at least twice a day on his back, neck, and hands.  (AR 176.)  Plaintiff stated that he has not noticed any side effects with his medications, except for "a little slower thinking" sometimes.  (AR 176.)  A carpal tunnel surgery was scheduled for May 7, 2018.  (AR 172.)

Plaintiff testified that he has "a lot of pain in [his] body."  (AR 178.)  According to Plaintiff, if he is "really in pain" in the morning, he takes a pain pill and then lies down for at least two to three hours before he tries to get up and take a shower.  (AR 178.)  Plaintiff then tries to walk around the house to "get the blood flowing" and then sits down to watch television.  (AR 178.) Plaintiff stated that he can sometimes stand and walk for about ten to fifteen minutes before he has to take a break.  (AR 178.)  Plaintiff estimated that he spends about an hour a day doing chores, doing a few minutes of activity at one time.  (AR 179–80.)

### 2.       Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as an auto body repairer, Dictionary of Operational Titles ("DOT") code 807.381-010, which was medium and skilled work, with a specific vocational preparation ("SVP")[6] of 7.  (AR 184–85.)  Plaintiff also had past work as an auto painter, DOT code 845.381-014, which was medium and skilled work, with an SVP of 6.  (AR 185.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience.  (AR 185.)  The VE was also to assume this person could perform a range of light exertional work, with the following limitations: occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no working at unprotected heights and uneven terrain or with ladders, ropes, or scaffolding; tolerance of occasional extreme cold and damp or wet environments; and frequent performance of bilateral handling or fingering.  (AR 185.)  The VE testified that person would not be able to perform Plaintiff's past work.  (AR 185.)  In response to whether such a person could perform any work in the national economy, the VE testified that such a person could perform light jobs with an SVP of 2, such as cashier II, DOT 211.462-01; cleaner, DOT 323.687.-014; and retail sales clerk, DOT 299.677-010.  (AR 185–86.)

The ALJ asked the VE, in a second hypothetical, to consider a person of Plaintiff's age, education, and work experience who could perform a range of light exertional work with the same limitations as in the first hypothetical, but that the person also needed to use a cane for ambulation.  (AR 186.)  The VE testified that such a person could not perform Plaintiff's past relevant work but could perform other light jobs in the national economy, such as cashier II; mail clerk, DOT 209.687-026; and assembler, DOT 712.687-010.  (AR 186–87.)

### D.       The ALJ's Decision

In a decision dated September 6, 2018, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 15–25.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 17–23.)  The ALJ determined that Plaintiff had not engaged in substantial

---

[6] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over ten years of preparation).  *Id.*

gainful activity since November 20, 2014, the onset date (step one).  (AR 17.)  At step two, the ALJ found Plaintiff's following impairments to be severe: degenerative disc disease of the lumbar spine and of the cervical spine "status post discectomy and fusion," CTS, and obesity.  (AR 17–18.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 18.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except he can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, occasionally work in extreme cold, damp environments, or wet environments, frequently handle and finger, never work at unprotected heights or on uneven terrain, and must use a cane for ambulation.

(AR 18.)[7]  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record."  (AR 19.)

The ALJ determined that, given his RFC, Plaintiff was not able to perform his past relevant work as an auto body repairer and auto painter (step four).  (AR 23.)  The ALJ ultimately concluded that Plaintiff was not disabled because Plaintiff could perform a significant number of other jobs in the national economy, specifically cashier II, mail clerk, and assembler (step five).  (AR 24.)

On September 7, 2018, Plaintiff sought review of the ALJ's decision before the Appeals Council and submitted records of the hand surgery he underwent on August 17, 2018.  (AR 2, 32–163.)  On June 10, 2019, the Appeals Council denied review, finding that the additional medical

---

[7] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  20 C.F.R. § 416.967(b).  Although the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  *Id.*

1  information "does not show a reasonable probability that it would change the outcome of the

2  decision.  We did not exhibit this evidence."  (AR 1–4.)  Therefore, the ALJ's decision became the

3  final decision of the Commissioner.  20 C.F.R. § 416.1481.

4  **III.    LEGAL STANDARD**

5  **A.    Applicable Law**

6  An individual is considered "disabled" for purposes of disability benefits if he or she is

7  unable "to engage in any substantial gainful activity by reason of any medically determinable

8  physical or mental impairment which can be expected to result in death or which has lasted or can

9  be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

10  However, "[a]n individual shall be determined to be under a disability only if his physical or mental

11  impairment or impairments are of such severity that he is not only unable to do his previous work

12  but cannot, considering his age, education, and work experience, engage in any other kind of

13  substantial gainful work which exists in the national economy."  *Id.* at § 423(d)(2)(A).

14  "The Social Security Regulations set out a five-step sequential process for determining

15  whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180

16  F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.  The

17  Ninth Circuit has provided the following description of the sequential evaluation analysis:

18  In step one, the ALJ determines whether a claimant is currently engaged in
19  substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ
   proceeds to step two and evaluates whether the claimant has a medically severe
20  impairment or combination of impairments.  If not, the claimant is not disabled.  If
   so, the ALJ proceeds to step three and considers whether the impairment or
21  combination of impairments meets or equals a listed impairment under 20 C.F.R. pt.
   404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If
22  not, the ALJ proceeds to step four and assesses whether the claimant is capable of
   performing her past relevant work.  If so, the claimant is not disabled.  If not, the
23  ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to
   perform any other substantial gainful activity in the national economy.  If so, the
24  claimant is not disabled.  If not, the claimant is disabled.

25  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also* 20 C.F.R. § 416.920(a)(4) (providing

26  the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be

27  'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

28  steps."  *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

1    "The claimant carries the initial burden of proving a disability in steps one through four of

2    the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

3    1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden

4    shifts to the Commissioner in step five to show that the claimant can perform other substantial

5    gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

6    **B.     Scope of Review**

7    "This court may set aside the Commissioner's denial of [social security] benefits [only] when

8    the ALJ's findings are based on legal error or are not supported by substantial evidence in the record

9    as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such

10   relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 

11   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

12   U.S. 197, 229 (1938)).   "Substantial evidence is more than a mere scintilla but less than a

13   preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

14   "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.*

15   *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed

16   only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell*

17   *v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).   Additionally, "[t]he court will uphold the ALJ's

18   conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*,

19   *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more

20   than one rational interpretation, the court may not substitute its judgment for that of the

21   Commissioner." (citations omitted)).

22   In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

23   of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

24   determine whether the Commissioner applied the proper legal standards and whether substantial

25   evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d

26   909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply

27   by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa*

28   *v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a

1  whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's]

2  conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

3  Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

4  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

5  454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record

6  that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*

7  *v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d

8  880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon

9  the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)

10  (citations omitted).

11  ## IV.   DISCUSSION

12  Plaintiff contends that the ALJ erred in three ways. First, Plaintiff claims the ALJ harmfully

13  erred in her evaluation of Dr. Cardona's opinion. (Doc. 18 at 12–18.) Second, Plaintiff asserts that

14  the ALJ improperly discounted Plaintiff's testimony regarding his subjective complaints. (Doc. 18

15  at 21–24.) Lastly, Plaintiff contends that substantial evidence does not support the ALJ's RFC

16  determination. (Doc. 18 at 18–21.) For the reasons stated below, the Court determines that the ALJ

17  properly considered Dr. Cardona's opinion but agrees with Plaintiff that the ALJ erred in her

18  evaluation of Plaintiff's testimony and will remand the case on that basis.

19  ### A.   The ALJ Properly Evaluated Dr. Cardona's Opinion

20  #### 1.   Legal Standard

21  The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. §

22  404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Mora v. Berryhill*, No. 1:16–

23  cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018). In doing so, the ALJ "cannot

24  reject [medical] evidence for no reason or the wrong reason." *Mora*, 2018 WL 636923, at *10.

25  Cases in this circuit distinguish between three types of medical opinions: (1) those given by

26  a physician who treated the claimant (treating physician); (2) those given by a physician who

27  examined but did not treat the claimant (examining physician); and (3) those given by a physician

28  who neither examined nor treated the claimant (non-examining physician). *Fatheree v. Colvin*, No.

1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015).  "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)).  The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

"To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995).  In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830–31.  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes*, 881 F.2d at 751).  The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund*, 253 F.3d at 1157,[8] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel*

---

[8] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

*v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751.

### 2.    Analysis

Plaintiff alleges—and the record reflects—that Dr. Cardona was Plaintiff's treating physician.  (*See* AR 643–75.)  Dr. Cardona's treatment notes in the record indicate that he treated Plaintiff regularly between February 2015 and February 2018.[9]  (AR 643–77.)  In a medical source statement submitted on Plaintiff's behalf on November 27, 2017, Dr. Cardona opined to extreme limitations on Plaintiff's ability to work.  (AR 520–24.)

In weighing Dr. Cardona's opinion, the ALJ stated:

> David Cardona, MD prepared a medical source statement . . . where he stated [Plaintiff] can sit and stand for ten minutes at a time, sit and stand/walk for fewer than two hours of an eight-hour day, must shift positions at will from sitting, standing, or walking, must take several unscheduled breaks per day, must elevate his feet, . . . can rarely lift and carry 10 pounds, can rarely twist, stoop, bend, crouch, squat, and climb stairs, never climb ladders, can grasp, turn and twist objects and engage in fine manipulation five percent of the workday, reach in all directions ten percent of the workday, will be off task for ten percent of the day, cannot perform even low stress work because of lack of concentration secondary to pain, and will be absent more than four days per month. The undersigned gives this opinion little weight. Dr. Cardoba's [sic] treatment notes show no treatment for carpal tunnel syndrome, and very little in the way of reference to that impairment besides a reference to [Plaintiff's] braces. Nor do they show any objective findings of abnormalities in [Plaintiff's] neck or back.  The record shows good results from [Plaintiff's] cervical fusion. Nerve testing showed no evidence of bilateral radiculopathy.  Examinations throughout 2017 and 2018 generally found [Plaintiff] with a normal gait, no sciatica, negative straight leg raising, and normal sensation, with reports of cane usage late in the period.

(AR 22) (internal citations omitted).

In sum, the ALJ discounted Dr. Cardona's opinion because it was unsupported by the medical evidence, including Dr. Cardona's own treatment notes.   Although not specifically identified by the ALJ as a basis for its rejection, Dr. Cardona's opinion is also contradicted by the opinion of consultative examiner Dr. Van Kirk. Dr. Van Kirk opined, *inter alia*, that Plaintiff is limited to lifting and carrying twenty pounds occasionally and ten pounds frequently (AR 456–57),

---

[9] Dr. Cardona's medical source statement indicates that he had been treating Plaintiff for seven years on a monthly basis as of November 27, 2017 (AR 520), but treatment notes from February 18, 2015 indicate that Plaintiff presented to Dr. Cardona on that date to "[e]stablish care" and was "[h]ere for new visit" (AR 643).

whereas Dr. Cardona opined that Plaintiff is limited to only rarely lifting and carrying ten pounds (AR 522).  Thus, the ALJ was required to set forth "specific and legitimate reasons," supported by substantial evidence, for rejecting Dr. Cardona's opinion.  *Trevizo*, 871 F.3d at 675.

Here, the ALJ properly gave little weight to Dr. Cardona's opinion regarding Plaintiff's physical limitations.  An ALJ may properly discount a treating physician's opinion that is unsupported by the medical record, including his own treatment notes.  *See Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (a treating physician's opinion is properly rejected where the physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]").  As the ALJ noted (AR 22), with regard to Plaintiff's CTS, Dr. Cardona's treatment notes made little reference to that impairment other than a notation that a splint was given for "[r]ight CTS."  (AR 650.)  Therefore, Dr. Cardona's own treatment notes provided no basis for the manipulative restrictions he opined should be imposed on Plaintiff.

The same is true for the other functional restrictions Dr. Cardona opined should be imposed.  The ALJ observed that Dr. Cardona's treatment notes did not show any objective findings of abnormalities in Plaintiff's neck or back.  (AR 22.)  Indeed, in the notes for each of Plaintiff's sixteen visits between February 2015 and February 2018, Dr. Cardona recorded that Plaintiff's neck was supple and had a normal range of motion.  (AR 643, 645, 647, 649, 651, 653, 655, 657, 659, 661, 663, 666, 668, 670, 672, 674.)  As for Plaintiff's back impairments, although Dr. Cardona's treatment notes reflected diagnoses of lumbar disc intervertebral disc degeneration (AR 643), lumbar disc disease (AR 660), and cervical disc disease (AR 667), the notes did not indicate reasons why these impairments would limit Plaintiff, *inter alia*, to sitting and standing for only ten minutes at a time and to lifting ten pounds only rarely.

The Court also notes that Dr. Cardona's opinion was mainly given in the form of a checklist, with little information as to what clinical findings supported the opinion or why any particular section on the checklist was marked.  (*See* AR 520–24.)  "A treating physician's opinion that is 'conclusory or brief' and lacks support of clinical findings may be rejected by an ALJ."  *Gomez v. Berryhill*, No. 1:17–cv–01035–JLT, 2019 WL 852118, at *8 (E.D. Cal. Feb. 22, 2019) (citation omitted); *see also Crane v. Shalala*, 76 F.3d 251 (9th Cir. 1996) ("The ALJ permissibly rejected . .

. check-off reports that did not contain any explanation of the bases of their conclusion"); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003). Thus, the ALJ properly rejected Dr. Cardona's opinion for the additional reason that there was little accompanying explanation supporting his responses on the medical source statement questionnaire.

Other medical evidence identified by the ALJ also fails to support Dr. Cardona's opined limitations. As the ALJ pointed out, the record supports "good results" from Plaintiff's cervical fusion in February 2017. (AR 23.) At follow-up appointments after his surgery, physical examinations revealed no balance or gait instability, no bowel or bladder dysfunction, and normal reflexes. (AR 558–60, 563.) Plaintiff was able to ambulate in a normal fashion, in addition to being able to heel, toe, and tandem walk without difficulty. (AR 558, 560–61, 563.) Nerve testing conducted in September 2017 showed no evidence of bilateral lumbar radiculopathy. (AR 497.) Other than an abnormal lumbar spine range of motion, physical examinations in the latter half of 2017 and early 2018 revealed normal strength and sensation in Plaintiff's lower extremities, negative straight leg raising, and a normal gait. (*See* AR 571–602.)

With regard to Plaintiff's CTS, the ALJ explained that the more restrictive limitations opined by Dr. Cardona were not warranted (AR 22) in light of Plaintiff's full upper extremity strength and bilateral grip strength at his April 2016 consultative examination (AR 456) and findings of intact upper extremity sensation at examinations throughout 2016 (*see* AR 537–54).[10]

Plaintiff does not appear to contest the ALJ's conclusion that Dr. Cardona's *own* treatment notes do not support Dr. Cardona's opined limitations. Rather, Plaintiff contends that objective findings from other treatments and examinations, for which Dr. Cardona was the referring physician, support Dr. Cardona's opinion, and the ALJ improperly "mischaracterized and cherry-picked evidence out of context" in support of her determination otherwise. (Doc. 18 at 13–18.)

---

[10] The ALJ also stated that "[e]xaminations throughout 2017 and 2018 generally found [Plaintiff] with normal sensation in his extremities." (AR 22.) The Court notes that this statement directly contradicts a prior statement by the ALJ—"[e]xaminations throughout 2017 and into early 2018 showed . . . diminished sensation to the first to third digits of [Plaintiff's] hands bilaterally" (AR 21)—that was articulated as part of her determination that Plaintiff was limited to "light work with manipulative limitations as stated" (AR 22). Nonetheless, the Court finds that the conflicting statements in this instance do not establish harmful error given that the ALJ considered evidence of Plaintiff's diminished sensation in his hands in determining his RFC. *Molina*, 674 F.3d at 1111 (reversal of ALJ's decision not warranted where error is harmless).

1   An ALJ may not consider only evidence that supports a non-disability determination and

2   disregard evidence that supports a finding of disability.  *Holohan v. Massanari*, 246 F.3d 1195, 1207

3   (9th Cir. 2001) (finding that "the ALJ's specific reason for rejecting [a physician's] medical opinion

4   [was] not supported by substantial evidence" because, in part, "the ALJ selectively relied on some

5   entries in [the plaintiff's] records . . . and ignored the many others that indicated continued, severe

6   impairment"); *Reddick v. Chater*, 157 F.3d 715, 722–23 (9th Cir. 1998) (the ALJ may not "cherry

7   pick" notes from the medical record to support a particular conclusion, but rather must evaluate the

8   entire record in its proper context).

9   Plaintiff first points to findings of mild to moderate disc height loss in his July 2016 lumbar

10   spine MRI (AR 485–86), for which Dr. Cardona was the "[o]rdering [p]hysician," as an example of

11   evidence undermining the ALJ's contention that Dr. Cardona's notes did not show any objective

12   findings of abnormalities in Plaintiff's neck or back.  (Doc. 18 at 15–16.)  Plaintiff, however, fails

13   to mention that the ALJ explicitly discussed why this evidence did not support more restrictions on

14   Plaintiff's ability to work.  (*See* AR 20, 21.)  As the ALJ explained:

15   
16   The July 26, 2016 MRI of [Plaintiff's] lumbar spine showed no change from imaging taken in 2010.   Despite those similar findings in 2010, [Plaintiff] was able to work at substantial gainful activity levels doing medium exertional work from 2011 through 2013, and at closed [sic] to substantial gainful activity levels until his alleged onset date in 2014.
17   

18   (AR 21.)

19   Next, Plaintiff claims that "the ALJ's contention that 'the record shows good results from

20   [Plaintiff's] cervical fusion [citations]' is also misleading" as his records post-surgery document that

21   he continued to suffer from pain in his lower extremities.  (Doc. 18 at 15–18.)  Again, Plaintiff

22   neglects to mention that the ALJ did in fact consider evidence of his ongoing pain.   The ALJ noted

23   that Plaintiff

24   
25   continued to report back and foot pain throughout 2017 and into 2018.  Treatment visits during that time showed reduced range of motion in [Plaintiff's] lumbar spine. [Plaintiff] reported to a February 2018 examination with a cane.  He received an epidural steroid injection in his lumbar spine on February 26, 2018.
26   

27   (AR 20) (internal citations omitted).  The ALJ recognized that, despite Plaintiff's February 2017

28   spine surgery, Plaintiff continued to have spinal impairments, and she consequently determined

Plaintiff was limited to "light work with postural and environmental limitations as stated in [Plaintiff's] residual functional capacity" and would need to "use a cane for ambulation." (AR 20.) Thus, the ALJ properly fulfilled her role by "setting out a detailed and thorough summary of the facts and conflicting evidence, stating her interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751.

Lastly, Plaintiff contends that the medical records of his carpal tunnel release, synovectomy in the carpal canal, and superficial neurolysis in August 2018 "support Dr. Cardona's disabling limitations on Plaintiff's manipulative ability" and renders the ALJ's decision unsupported by substantial evidence.[11] (Doc. 18 at 20.) The Court disagrees. The ALJ gave little weight to Dr. Cardona's opinion because there was little medical evidence to support the significant limitations opined by Dr. Cardona on Plaintiff's ability to handle or finger objects. (AR 22.) That Plaintiff ultimately underwent hand surgery (AR 35, 37–38, 130) does not undermine that determination, as the ALJ had already noted in her decision that Plaintiff "was scheduled for surgery in the right hand" (AR 22). Furthermore, the surgical records do not document Plaintiff's condition beyond the immediate period following the surgery, so there are no new findings to support Dr. Cardona's more restrictive manipulative limitations. Ultimately, Plaintiff's additional surgical records do not provide any new information sufficient to render the ALJ's decision unsupported by substantial evidence.

In sum, the ALJ determined that Dr. Cardona's opinion—that Plaintiff is limited to rarely lifting and carrying ten pounds and engaging in fine manipulations for only five percent of the workday—was unsupported by Dr. Cardona's own treatment notes and the broader medical record. This is a specific, legitimate reason supported by substantial evidence for discounting Dr. Cardona's opinion. *See Magallanes*, 881 F.2d at 751; *see also Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th

---

[11] Plaintiff submitted evidence of his August 17, 2018 surgical procedures with his request for Appeals Council review of the ALJ's decision. (AR 2, 32–163.) The Appeals Council denied review of Plaintiff's claim and "did not exhibit this evidence," finding that "this evidence does not show a reasonable probability that it would change the outcome of the decision." (AR 2.) The Court considers this additional evidence in determining whether the ALJ's decision is supported by substantial evidence. *See Brewes v. Commissioner*, 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence.").

Cir. 2005); *Batson*, 359 F.3d at 1195.  As the Court may neither reweigh the evidence nor substitute

its judgment for that of the Commissioner, it will not disturb the ALJ's finding on this basis, even

if, as Plaintiff suggests (*see, e.g*, Doc. 18 at 14–18), some of the above-described evidence could be

construed more favorably to him.  *See Robbins*, 466 F.3d at 882; *Thomas v. Barnhart*, 278 F.3d 947,

954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one

of which supports the ALJ's decision, the ALJ's conclusion must be upheld"); *Batson*, 359 F.3d at

1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we

may not substitute our judgment for that of the ALJ.").

**B.      The ALJ Harmfully Erred in the Evaluation of Plaintiff's Testimony**

**1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding their impairments, an ALJ

must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First,

the ALJ must determine whether the claimant has presented objective medical evidence of an

underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Id*.  The

claimant is not required to show that their impairment "could reasonably be expected to cause the

severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused

some degree of the symptom."  *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir.

2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only

reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and

convincing reasons" for the rejection.  *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including
> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation
> for lying, prior inconsistent statements concerning the symptoms, and other
> testimony by the claimant that appears less than candid; (2) unexplained or
> inadequately explained failure to seek treatment or to follow a prescribed course of
> treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported
> by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.

Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may

consider include a claimant's work record and testimony from physicians and third parties

1  concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Social*

2  *Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

3        The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

4  demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.

5  2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General

6  findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not

7  credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d

8  1133, 1138 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 834)).

9        **2.**      **Analysis**

10        The ALJ found that Plaintiff's "medically determinable impairments could reasonably be

11  expected to cause the alleged symptoms."  (AR 19.)  The ALJ also found that "[Plaintiff's]

12  statements concerning the intensity, persistence and limiting effects of these symptoms are not

13  entirely consistent with the medical evidence and other evidence in the record for the reasons

14  explained in this decision." (AR 19.)  Since the ALJ found that Plaintiff's "medically determinable

15  impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue

16  is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse

17  credibility finding.  *See Vasquez*, 572 F.3d at 591.

18        The ALJ gave only one specific reason as to why Plaintiff's symptom statements were less

19  than credible: they were inconsistent with the objective medical evidence.  (AR 19.)  The Court

20  finds this is not a specific, clear and convincing reason to discount Plaintiff's testimony because the

21  ALJ may not reject a claimant's subjective statements for the sole reason that the testimony is

22  inconsistent with the objective evidence.  *See Brown-Hunter v. Colvin*, 806 F.3d 487, 493–94 (9th

23  Cir. 2015).  Further, the ALJ failed to even specify which statements she found to be less than

24  credible and why.  This is required because, without that specification, the Court is left to speculate

25  as to which statements the ALJ intended to discount and how they are undermined by the evidence,

26  which the Court may not do.  *See id.* at 494–95 ("We cannot review whether the ALJ provided

27  specific, clear and convincing reasons for rejecting [the claimant]'s pain testimony where, as here,

28  the ALJ never identified *which* testimony she found not credible, and never explained *which*

1    evidence contradicted that testimony . . . . In sum, we cannot substitute our conclusions for the

2    ALJ's, or speculate as to the grounds for the ALJ's conclusions.").

3         The Court also notes that the ALJ's proffered reason for discounting Plaintiff's testimony—

4    that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these

5    symptoms are not entirely consistent with the medical evidence and other evidence in the record for

6    the reasons explained in this decision"—has been criticized by courts, including the Ninth Circuit,

7    as "boilerplate language." *See, e.g.*, *Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017)

8    (citing *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)).  The Ninth Circuit found this kind of

9    language to be "problematic," as it "subverts the way an RFC must be determined relying on credible

10   evidence, including testimony."  *Id.*  "[I]nclusion of [the] flawed boilerplate language" "does not . .

11   . add anything to the ALJ's determination."  *Id.*  Because the ALJ included only the boilerplate

12   language and did not specifically identify "the reasons explained in the decision," her analysis of

13   Plaintiff's subjective complaints was flawed.

14        In an effort to salvage the adverse credibility determination, the Commissioner points to

15   statements made by the ALJ in her summation of the medical evidence supporting her RFC

16   determination and contends the ALJ provided clear and convincing reasons for discounting

17   Plaintiff's testimony beyond just inconsistency with the medical evidence.  (Doc. 21 at 18–23.)

18   Specifically, the Commissioner contends that the ALJ discredited Plaintiff on the additional bases

19   that his testimony was inconsistent with his treatment, activities, own statements to his doctors, and

20   other medical opinions.

21        The Ninth Circuit has explained, however, that "summariz[ing] the medical evidence

22   supporting [the] RFC determination . . . is not the sort of explanation or the kind of 'specific reasons'

23   [the Court] must have in order to . . . ensure that the claimant's testimony was not arbitrarily

24   discredited."  *See, e.g., Brown-Hunter*, 806 F.3d at 494.  Thus, "the observations an ALJ makes as

25   part of the summary of the medical record are *not* sufficient to establish clear and convincing reasons

26   for rejecting a Plaintiff's credibility.  Instead, the ALJ must *link* the medical evidence at issue to the

27   Plaintiff's testimony."  *Argueta v. Colvin*, No. 1:15–cv–01110–SKO, 2016 WL 4138577, at *13

28   (E.D. Cal. Aug. 3, 2016) (citations omitted, emphasis in the original).

1    Here, the ALJ did not specifically identify which parts of the record conflicted with which

2   portions of Plaintiff's testimony.  Because this Court's review is limited to the rationale provided

3   by the ALJ, the post-hoc rationalizations and inferences advanced by the Commissioner cannot

4   justify the ALJ's rejection of Plaintiff's subjective testimony.  *See Bray*, 554 F.3d at 1225 ("Long-

5   standing principles of administrative law require [the court] to review the ALJ's decision based on

6   the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to

7   intuit what the adjudicator may have been thinking."); *Ceguerra v. Sec'y of Health & Human Servs.*,

8   933 F.2d 735, 738 (9th Cir. 1991) ("A reviewing court can evaluate an agency's decision only on

9   the grounds articulated by the agency.").

10        **3.      The ALJ's Error Was Not Harmless**

11        The Court now turns to the analysis of whether this error by the ALJ was harmless.  The

12   Ninth Circuit "ha[s] long recognized that harmless error principles apply in the Social Security Act

13   context."  *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054); *see also Garcia v. Comm'r of

14   Soc. Sec.*, 768 F.3d 925, 932 n.10 (9th Cir. 2014) (stating that the harmless error analysis applies

15   where the ALJ errs by not discharging their duty to develop the record).  As such, "the court will

16   not reverse an ALJ's decision for harmless error."  *Tommasetti*, 533 F.3d at 1038 (citing *Robbins*,

17   466 F.3d at 885).

18        An error is harmless "where it is inconsequential to the ultimate nondisability

19   determination."  *Molina*, 674 F.3d at 1115 (citations omitted); *see also Treichler v. Comm'r of Soc.

20   Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (stating that an error is also harmless "'if the

21   agency's path may reasonably be discerned,' even if the agency 'explains its decision with less than

22   ideal clarity'" (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).  "In

23   other words, in each case [courts] look at the record as a whole to determine whether the error alters

24   the outcome of the case."  *Molina*, 674 F.3d at 1115.  "[T]he nature of [the] application" of the

25   "harmless error analysis to social security cases" is "fact-intensive—'no presumptions operate' and

26   '[courts] must analyze harmlessness in light of the circumstances of the case.'"  *March v. Colvin*,

27   792 F.3d 1170, 1172 (9th Cir. 2015) (quoting *Molina*, 674 F.3d at 1121).  "[T]he burden of showing

28   that an error is harmful normally falls upon the party attacking the agency's determination."

1  *Shinseki*, 556 U.S. at 409 (citations omitted).

2        The Commissioner does not contend that any error by the ALJ in evaluating Plaintiff's

3  credibility was harmless (*see* Doc. 21 at 18–23), and the record establishes that the ALJ's error was

4  not harmless.  If the ALJ had credited Plaintiff's physical symptom statements regarding certain

5  functional abilities and included appropriate limitations in the RFC, that may have changed the

6  disability determination, especially given that Plaintiff alleged fairly significant limitations,

7  including difficulty picking up regular household objects.  (*See* AR 177–79.)  Thus, the error was

8  not "inconsequential to the ultimate nondisability determination," *Molina*, 674 F.3d at 1115, and

9  was not harmless.

10  **C.      The ALJ's Error Warrants Remand for Further Proceedings**

11        Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to

12  remand to the agency for additional investigation or explanation."  *Treichler*, 775 F.3d at 1099

13  (citations omitted).  The Ninth Circuit recognized a limited exception to this typical course where

14  courts "remand[] for an award of benefits instead of further proceedings."  *Id.* at 1100–01 (citations

15  omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-

16  true' rule").  In determining whether to apply this exception to the "ordinary remand rule," the court

17  must determine, in part, whether (1) "the record has been fully developed;" (2) "there are

18  outstanding issues that must be resolved before a determination of disability can be made;" and (3)

19  "further administrative proceedings would be useful."  *Id.* at 1101 (citations omitted).  As to the last

20  inquiry, additional "[a]dministrative proceedings are generally useful where the record has not been

21  fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further

22  evidence . . . may well prove enlightening in light of the passage of time."  *Id.* (citations omitted).

23  Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award

24  benefits is in [the court's] discretion."  *Swenson*, 876 F.2d at 689 (citation omitted).

25        The Court finds that the "credit-as-true" exception to the "ordinary remand rule" is

26  inapplicable in this case because additional administrative proceedings would be useful.  If the ALJ

27  changes her evaluation of Plaintiff's subjective complaints, she should incorporate any warranted

28  additional limitations in the RFC.  Conversely, there may be specific, clear and convincing reasons

the ALJ can offer for discounting the testimony.  *See Voisard v. Berryhill*, No. 2:17–CV–1023-EFB, 2018 WL 4488474, at \*5 (E.D. Cal. Sept. 19, 2018) ("That the ALJ failed to provide sufficient reasons for discounting plaintiff's subjective testimony in this instance does not compel a finding that he is unable to do so.").

Even if the ALJ decides to credit as true some or all of Plaintiff's symptom statements and adjust her RFC determination for Plaintiff, the ALJ may still conclude that Plaintiff is not disabled because he has the RFC to perform the requirements of other work that exists in significant numbers in the national economy.  The ALJ may also elect to further develop the record, if deemed necessary.  Further proceedings would therefore be useful to allow the ALJ to resolve this "outstanding issue[ ]" before a proper disability determination can be made.  *See Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988).

On remand, the ALJ should reevaluate Plaintiff's symptom testimony and address any necessary changes to the RFC determination.  If the ALJ again discounts Plaintiff's subjective symptoms, she can then provide an adequate discussion of the specific testimony she is discounting and the specific evidence that contradicts that testimony.  *See Payan v. Colvin*, 672 F. App'x 732, 733 (9th Cir. 2016).  The ALJ must also reevaluate her conclusions at Steps Four and Five of the disability determination in light of any changes to Plaintiff's RFC.

## V.      CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is therefore VACATED, and the case is REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Daniel Ochoa Lopez and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **November 13, 2020**                                   /s/ *Sheila K. Oberto*
                                                                    UNITED STATES MAGISTRATE JUDGE